901 P.2d 1272

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Keila SUKA, Jr., Defendant–Appellant.**

**No. 16500.**

Intermediate Court of Appeals of Hawai'i.

Aug. 10, 1995.

Certiorari Denied Aug. 31, 1995.

---

**294**

Richard T. Pafundi, on the brief, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Atty., on the brief, Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

Defendant–Appellant Keila Suka, Jr. (Defendant) was indicted on March 25, 1987. He was charged with the following felony offenses: Count I, Rape in the First Degree; Count II, Kidnapping; Count III, Sexual Abuse in the First Degree; Count IV, Rape

in the First Degree; Count V, Sodomy in the First Degree; Count VI, Kidnapping; Counts VII and VIII, Sexual Abuse in the First Degree.[1] All counts involved the same complaining witness (Witness). The incidents described in the first three counts allegedly occurred on May 9, 1986, the last five counts on May 16, 1986. Defendant was convicted on all counts following a third trial of the charges alleged in the indictment. He was sentenced on Counts I, IV, and V to an extended term of life imprisonment; on Counts II and VI to an extended term of twenty years; and on Counts III, VI, and VIII to an extended term of ten years; the sentences to be served concurrently with credit for time served.

Defendant appeals from the August 14, 1992 judgment of conviction on the sole ground that during closing argument, the prosecutor improperly argued that Witness had not engaged in sexual intercourse with anyone prior to the alleged assault by Defendant on May 9, 1986. We believe that the standard to be applied in this case is whether the statement was harmless beyond a reasonable doubt under Hawai'i Rules of Penal Procedure (HRPP) Rule 52(a) and, concluding the error was harmless, we affirm the judgment.

Defendant had been convicted of all the offenses at his first trial. However, after an appeal, the convictions were set aside on July 12, 1989. *State v. Suka*, 70 Haw. 472, 777 P.2d 240 (1989). The second trial ended in a mistrial on October 31, 1991, because the jury was unable to reach a verdict.

At the second trial, the trial court had issued a written order granting the State's motion in limine prohibiting Defendant from referring to any sexual conduct by Witness with other people. This December 4, 1991 order stated:

> 2. Pursuant to State's Motion in Limine filed on November 1, 1989, ... the [c]ourt rules as follows:
>
> . . . .
>
> (a) The person intentionally, by forcible compulsion, engages in deviate sexual intercourse with another person or causes another person to engage in deviate sexual intercourse, and:
> (i) The other person was not, upon the occasion, his [or her] voluntary social companion who had within the previous thirty days permitted him [or her] sexual contact of the kind involved[.]
>
> HRS § 707–733(1)(a)(i) (1985).
> The following definitions under the statute are also applicable:
> (7) "Sexual intercourse" means sexual intercourse in its ordinary meaning or any intrusion or penetration, however slight, of any part of a person's body, or of any object, into the genital opening of another person, but emission is not required;
> (8) "Deviate sexual intercourse" means any act of sexual gratification:
> (a) Between persons not married to each other involving the sex organs of one and the mouth or anus of the other; ...
>
> . . . .
>
> (9) "Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor, done with the intent of gratifying the sexual desire of either party[.]
>
> HRS § 707–700 (1985).

[1] Those parts of the statutes applicable to the facts of this case are:

> § 707–730 *Rape in the first degree.* (1) A person commits the offense of rape in the first degree if:
> (a) The person intentionally engages in sexual intercourse, by forcible compulsion, with another and:
> (i) The other person is not, upon the occasion, his [or her] voluntary social companion who had within the previous thirty days permitted him [or her] sexual intercourse of the kind involved[.]
>
> Hawai'i Revised Statutes (HRS) § 707–730(1)(a)(i) (1985).
>
> § 707–720 *Kidnapping.* (1) A person commits the offense of kidnapping if he [or she] intentionally restrains another person with intent to:
> . . . .
> (d) Inflict bodily injury upon him [or her] or subject him [or her] to a sexual offense[.]
>
> HRS § 707–720(1)(d) (1985).
>
> § 707–736 *Sexual abuse in the first degree.* (1) A person commits the offense of sexual abuse in the first degree if:
> (a) He [or she] intentionally, by forcible compulsion, has sexual contact with another or causes another to have sexual contact with him [or her][.]
>
> HRS § 707–736(1)(a) (1985).
>
> § 707–733 *Sodomy in the first degree.* (1) A person commits the offense of sodomy in the first degree if:

(b) In numeral 2, the motion is granted, prohibiting Defendant from referring to any alleged sexual conduct by the [Witness] with people other than the Defendant.

On June 30, 1992, at the beginning of the third trial, the court indicated that it would follow the foregoing order, stating: "I will do my best to follow earlier rulings on Motions in Limine. It does appear in the December 4th, 1991 order and item 2(b), [sic] any reference to alleged sexual conduct by the complainant with other people is prohibited *in total*. And I'll follow that." [2] (Emphasis added.) We interpret this order to properly prohibit reference by either Defendant or the State to the irrelevant issue of Witness' prior sexual experience.

Jury selection for the third trial began on June 30, 1992. However, on June 30, 1992, the jury panel was discharged before a jury was sworn.[3] Defendant's consequent motion for a mistrial was denied. Thereafter, a jury was selected from a new panel, its members sworn, and trial proceeded. On July 7, 1992, at the close of the State's case, Defendant's motion for a judgment of acquittal was denied. On July 9, 1992, during the State's closing argument, the prosecutor made the following statement about Witness's sexual status on May 9, 1986:

[L]ook very carefully at these photographs of the mattress that [Defendant] took her to on May 9th. Is this a place, ladies and gentlemen, where a girl, at the age of 14, for her first sexual experience, would choose to go to—

MR. PAFUNDI [ (defense counsel) ]: Objection Your Honor. May we approach?

Defendant moved to "reopen the defense case" to call witnesses "as to whether or not

... [Witness] ever did have sex with other individuals." He also moved for a mistrial.

The court denied both motions. It ordered the jury to disregard the prosecutor's statement. The court made the following ruling regarding the prosecutor's statement:

THE COURT: ... At this time, the [c]ourt will strike from the record the last portion of the prosecutor's argument, which stated to the effect, "Is this a place where a 14 year old girl for her first sexual experience would chose [sic] to go." That statement will be stricken and the jury will totally disregard that. Please proceed, Miss Silberstein [ (deputy prosecutor) ].

During the bench conference, the court also indicated that it would allow defense counsel to state to the jury that no evidence had been presented that the sexual contacts in May were the only ones Witness had ever had. The court stated in pertinent part that:

[THE COURT:] The [c]ourt will, also, allow the defense to state in its closing that, if the defense chooses, that the jury was not given any evidence about whether this was prior·or only—whether these sexual contacts were the only ones of [Witness] or not, to at least allow the defense to rebut the statement that had been made by the State but not beyond that, Mr. Pafundi.

Apparently following up on the court's invitation, Defendant's counsel stated in closing argument that, "The prosecutor told you that this was [Witness's] first sexual experience. There is absolutely no evidence to support that contention. This remark was stricken from the record by the judge."

After the jury was charged, the court denied Defendant's "motion to reopen the evidence."

**2.** However, testimony that the complaining witness (Witness) engaged in "oral sex" with her boyfriend following the alleged assault by Defendant on May 16, 1986 was allowed by agreement of the parties:

THE COURT: So you're not objecting to Mr. Pafundi [ (defense counsel) ] bringing in evidence, even though it may be in violation of ... [the] ruling, that the complaining witness

allegedly had oral sex with Mr. Sau [ (Witness's boyfriend) ] on May 16th?
MS. SILBERSTEIN [ (deputy prosecutor) ]: That's correct.

**3.** The mistrial was ordered because the bailiff told the jury panel what the charges were and some of the jurors discussed the case and arrived at conclusions about Defendant's guilt or innocence.

On July 9, 1992, the jury returned verdicts of guilty on all counts.

On July 20, 1992, Defendant moved for a new trial, one of the grounds being the subject of the prosecutor's remarks in closing argument.

On September 23, 1992, the court denied Defendant's motion for new trial,[4] finding there was "an insufficient basis to grant Defendant's [m]otion[.]"

Defendant, thereafter, filed this appeal contending that the prosecutor's remark constituted prejudicial misconduct and, as a result, the trial court erred in denying Defendant's motions to reopen the evidence, for mistrial, to dismiss the charges, and for a new trial.[5]

## I.

■ We agree with the trial court that the statement was improper. Evidence regarding Witness's prior sexual history or experience had been expressly excluded from trial by court order at the request of the State itself. Moreover, the prosecutor's statement, "Is this a place, ladies and gentlemen, where a girl, at the age of 14, for her first sexual experience, would choose to go to—" was not based on any evidence admitted at trial. In conformance with the court's order, no evidence was admitted concerning Witness's

---

**4.** The court cited *State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied*, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973); *State v. Melear*, 63 Haw. 488, 630 P.2d 619 (1981); and *State v. Hamala*, 73 Haw. 289, 834 P.2d 275 (1992).

**5.** Defendant contends in his opening brief that the trial court erred in denying his trial motion to dismiss the charges. The transcripts of the proceedings do not indicate that Defendant expressly moved to dismiss the charges. However, because we hold that the error was harmless, even if Defendant had expressly made the motion to dismiss, the trial court would have been correct in denying the motion.

**6.** The defense did ask Witness a series of questions regarding whether she had had sexual relations with persons other than Defendant during May 1986. Witness replied that she had not.

prior sexual experience. Contrary to the State's argument, Witness's virginity was not a matter that might be reasonably inferred from her testimony that she had not had sexual relations with her boyfriend of eight months at the time of the incidents. Quite simply, the State violated its own requested court order.[6]

The State disingenuously argues that the statement was "not entirely improper." Plainly, the statement had no relevance to any material issue, and its only effect would be to invoke sympathy for Witness and antipathy towards Defendant. *Cf. State v. Toro*, 77 Hawai'i 340, 346–47, 884 P.2d 403, 410, *reconsideration denied*, 77 Hawai'i 340, 884 P.2d 403 (App.), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994). This was the same prosecutor's third trial in the State's attempt to convict Defendant. It strains credulity to believe that the statement was mere inadvertence.

■ There comes a point at which the trial court should exercise its power to sanction improper statements of this kind. Failure to take deterrent action only encourages the belief that such conduct, while disapproved, is tolerated, leading not only to a lower standard of justice in our courts but also to needless appeals. In the future, trial courts should consider sanctions to deter such improper statements.

We next turn to the question of whether the judgment must be set aside as a result of this improper statement.

The questions only went to May 1986 and not to a "first sexual experience." The State did not object to the questions on the basis that they violated the order, and the trial court did not indicate that the questions violated its order, see note 2, *supra*. The State does not raise this point on appeal.

We do not find that the prosecutor's remark could be reasonably construed as relating to the defense's questions although the State contends that the questions and answers did form the basis for the prosecutor's statement. Although the questions and answers established that Witness did not engage in sexual relations with anyone during May 1986, they did not establish that Witness did not have such relations prior to May 1986 and, therefore, the prosecutor did not have an evidentiary basis for suggesting that Witness was a virgin at the time of the alleged assaults.

## II.

At the outset, we are faced with the question of which standard to apply under HRPP Rule 52(a). HRPP Rule 52(a) states in part that "any error, defect, [or] irregularity ... which does not affect substantial rights shall be disregarded." HRPP Rule 52(a) is the same as Federal Rules of Criminal Procedure Rule 52(a). HRPP Rule 52(a) "applies to both the trial courts and the appellate courts[,] ... [and although] it is relied on primarily by the appellate courts, ... [its] standards ... are [also] controlling when a trial court is passing on a post-trial motion." 3A C. Wright, *Federal Practice and Procedure: Criminal* § 851, at 294 (2d ed. 1982) (footnote omitted). Under HRPP Rule 52(a), "[a]n error that did not prejudice the defendant is deemed 'harmless error,' and disregarded, ... [and an error which] may have been prejudicial ... is 'reversible error'" and may result in the reversal of a conviction or in a new trial. *Id.*

The question is presented to us because of an array of standards employed. While many of the cases can be understood and categorized in a manner we believe is consistent with the guidelines established by case law, other cases are not easily susceptible to classification. But the rules which have evolved in the development of harmless error case law have established four fairly distinct categories of cases. We summarize the standards applied in these categories. First, are those cases involving federal and/or state "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error[.]" *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967). *Accord State v. Silva,* 78 Hawai'i 115, 121, 890 P.2d 702, 708 (App. 1995) (right to impartial judge). Second, are those cases involving the violation of all other federal and/or state constitutional rights which the appellate court must find to have been harmless beyond a reasonable doubt before they can be deemed harmless. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828; *State v. Okumura,* 58 Haw. 425, 431, 570 P.2d 848, 853 (1977); *State v. Pokini,* 57 Haw. 26, 29,

548 P.2d 1402, 1405, *cert. denied,* 429 U.S. 963, 97 S.Ct. 392, 50 L.Ed.2d 332 (1976); *Silva,* 78 Hawai'i at 125, 890 P.2d at 712. Third, are those cases involving a limited number of rights, not of constitutional magnitude, but the violation of which has been deemed never to be harmless. *E.g. State v. Carvalho,* 79 Hawai'i 165, 880 P.2d 217 (App.), *cert. granted,* 77 Hawai'i 373, 884 P.2d 1149 (1994), *cert. dismissed,* 78 Hawai'i 474, 896 P.2d 930 (1995) (peremptory challenges). Finally, there are those errors not of constitutional magnitude which may be deemed harmless unless the violation substantially affected the verdict or outcome of the case. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *State v. Arnold,* 66 Haw. 175, 657 P.2d 1052 (1983); *State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403, 410, *reconsideration denied,* 77 Hawai'i 340, 884 P.2d 403 (App.), *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

More recently, however, a five-member majority of the United States Supreme Court has sought to re-fashion the law pertaining to constitutional errors by establishing two categories: "trial errors" and "structural errors." *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

In *Fulminante,* the majority held that constitutional errors which are trial errors, i.e., errors "which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt" may be found to be harmless errors. *Id.* at 307–08, 111 S.Ct. at 1264. On the other hand, constitutional structural errors "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" cannot be harmless error. *Id.* at 310, 111 S.Ct. at 1265. Structural defects such as lack of defense counsel, exclusion from the grand jury of persons of the same race as defendant, and the right to a public trial, were held never harmless because "'[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a

vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (citations omitted)). Under the majority opinion in *Fulminante,* constitutional structural errors are per se reversible whereas constitutional trial errors are reversible if they are not harmless beyond a reasonable doubt.

The four dissenters charged the majority with "drawing a meaningless dichotomy between 'trial errors' and 'structural defects' in the trial process[,]" *id.* at 290, 111 S.Ct. at 1254 (White, J., dissenting), because " 'certain constitutional rights ... protect important values that are unrelated to the truth seeking function of the trial.' " *Id.* at 295, 111 S.Ct. at 1257 (White, J., dissenting) (quoting *Rose,* 478 U.S. at 587, 106 S.Ct. at 3111 (Stevens, J., concurring)).

The pertinent issue upon which the justices diverged was whether the use of a coerced confession at trial was never harmless or subject to the harmless beyond a reasonable doubt standard. According to the majority, the admission of a coerced confession was subject to the harmless beyond a reasonable doubt standard set forth in *Chapman.* *Id.* at 309, 111 S.Ct. at 1264. Thus, the majority asserted that the admission of a coerced confession was "a classic 'trial error' " subject to the harmless beyond a reasonable doubt standard. *Id.*

The dissent, on the other hand, maintained that the admission of a coerced confession was not subject to the harmless beyond a reasonable doubt standard and could never be treated as harmless error because our criminal system is " 'an accusatorial and not an inquisitorial system[.]' " *Id.* at 293, 111 S.Ct. at 1256 (White, J., dissenting) (quoting *Rogers v. Richmond,* 365 U.S. 534, 540–41, 81 S.Ct. 735, 739–40, 5 L.Ed.2d 760 (1961)).

In considering claimed violations of federal constitutional rights, our appellate courts would be bound by the majority's holding in *Fulminante.* But with respect to parallel provisions of the Hawai'i Constitution, we would be free to adopt the dissent's rationale, if we believed the majority's opinion would lead to unsound results. Under our ultimate holding we need not reach this issue. However, "[i]t is well established that broader rights may be afforded to our citizens under our state constitution than under the federal constitution." *State v. Chow,* 77 Hawai'i 241, 247, 883 P.2d 663, 669 (App.1994). *See State v. Hoey,* 77 Hawai'i 17, 36, 881 P.2d 504, 523 (1994). Clearly, the Hawai'i Supreme Court may declare a Hawai'i constitutional right so basic to a fair trial that its contravention can never be deemed harmless. *Silva,* 78 Hawai'i at 121, 890 P.2d at 708. For example, the Hawai'i Supreme Court has held that the use of a coerced confession in a criminal trial under the Hawai'i Constitution would be fundamentally unfair. *State v. Bowe,* 77 Hawai'i 51, 881 P.2d 538 (1994).

We are not confronted here with the claim that the prosecutor's argument violated any specific constitutional right of Defendant. The prosecutor's remark concerned the sexual status of Witness and did not involve a constitutional right of Defendant's "so basic to a fair trial that [its] infraction can never be treated as harmless error[,]" *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–28, or a specific constitutional right of Defendant ostensibly requiring the application of the "harmless beyond a reasonable doubt" standard. *Id.* at 24, 87 S.Ct. at 828.

Our supreme court has applied the harmless beyond a reasonable doubt standard where the prosecutor's argument improperly commented on the defendant's fifth amendment constitutional right to remain silent, as required under *Chapman.* *State v. Melear,* 63 Haw. 488, 496, 630 P.2d 619, 626 (1981). However, comments by prosecutors during trial have also been subjected to the harmless beyond a reasonable doubt standard even where a specific constitutional right of the defendant was not directly implicated. *State v. Nakoa,* 72 Haw. 360, 370–71, 817 P.2d 1060, 1066 (1991) (prosecutor's improper comment on the credibility of a police witness during rebuttal argument held to be harmless beyond a reasonable doubt); *State v.*

*Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1302–03 (1986) (prosecutor's improper assertion of her personal opinions during closing arguments held to be not harmless beyond a reasonable doubt); *State v. Amorin,* 58 Haw. 623, 629, 574 P.2d 895, 899 (1978) (prosecutor's improper comment during closing argument that if acquitted the defendant would "walk the streets" held to be harmless beyond a reasonable doubt). *But cf. State v. Kahalewai,* 55 Haw. 127, 129, 516 P.2d 336, 338 (1973) (although no standard of review was stated, prosecutor's statements outside of the evidence and misstatements of the law and evidence held to be cured by court's instructions to the jury and to be harmless because of the overwhelming evidence of defendant's guilt). Likewise, we have applied the harmless beyond a reasonable doubt standard to improper statements by the prosecutor where a specific constitutional right of the defendant was not directly involved. *State v. Hirano,* 8 Haw.App. 330, 339, 802 P.2d 482, 487 (1990) (prosecutor's improper comments and objection during opening statements held to be harmless beyond a reasonable doubt).

In applying the harmless beyond a reasonable doubt standard the court is required to examine the record and determine "whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. Thus, before the error can be held harmless, " 'the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " *Cf. Silva,* 78 Hawai'i at 125, 890 P.2d at 712 (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828).

█ The "harmless beyond a reasonable doubt" standard of review is to be contrasted with the "harmless error" standard of review. *See United States v. Seidel,* 620 F.2d 1006, 1013 n. 13 (4th Cir.1980) ("In the constitutional error situation, the [c]ourt must apply the 'harmless beyond a reasonable doubt' rule, while in other situations, the 'harmless error' rule is applicable if no substantial rights of the accused were affected"); *United*

*States v. Shepherd,* 576 F.2d 719, 723–24 (7th Cir.1978); *United States v. Panczko,* 429 F.2d 683, 686 & n. 6 (7th Cir.1970). The harmless error standard under HRPP Rule 52 requires that the court examine the entire record to determine " 'whether the error itself had substantial influence' upon the jury's verdict." *Toro,* 77 Hawai'i at 347, 884 P.2d at 410 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). Following the categories we have set forth, it is arguable that the "harmless error" standard would apply here. In that event, our inquiry would be whether the prosecutor's remarks had "a substantial influence upon the jury's verdict." On the other hand, the prosecutor's remarks could affect Defendant's right to a fair trial, and the cases we have reviewed sustain the proposition that improper remarks of a prosecutor which impinge upon the defendant's due process right to a fair trial properly invoke the "harmless beyond a reasonable doubt" standard. *See Nakoa,* 72 Haw. at 370–71, 817 P.2d at 1066 (defendant contended that he was deprived of his right to a fair trial; court held that the prosecutor's comments were harmless beyond a reasonable doubt); *Marsh,* 68 Haw. at 661, 728 P.2d at 1302–03 (error held to have prejudiced defendant's right to a fair trial); *Hirano,* 8 Haw.App. at 338, 802 P.2d at 487 (defendant argued that his right to a fair trial was violated by a combination of prosecutorial misconduct and ineffective assistance of counsel); *State v. Corpuz,* 3 Haw.App. 206, 211, 646 P.2d 976, 980 (1982) (court stated that in a different context the error claimed could have been destructive of a defendant's right to a fair trial). The Hawai'i courts do have the right to provide greater protection to defendants than provided under the federal constitution. *See State v. Quino,* 74 Haw. 161, 170, 840 P.2d 358, 362, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993); *Silva,* 78 Hawai'i at 121, 890 P.2d at 708.

█ In any event, the foregoing cases are controlling and we are bound by the supreme

court decisions. Thus, to determine whether reversal is required under HRPP Rule 52(a) because of improper remarks by a prosecutor which could affect Defendant's right to a fair trial, we apply the harmless beyond a reasonable doubt standard of review. Accordingly, we examine the record to determine whether there is a reasonable possibility that the prosecutor's statement might have contributed to the verdict.

### III.

Witness testified to the following matters which occurred on the island of Oʻahu. She knew Defendant as a friend of her boyfriend, Televise Sau (Sau). On May 9, 1986, she placed a call to the pay phone near Sau's home and Defendant answered the telephone. Defendant told her that he and Sau would pick her up. Defendant arrived alone. He said that Sau had asked him to pick her up. She went with him because she trusted him to take her to Sau's house.

Instead, Defendant stopped at Pōkaʻī Bay Beach and started talking about Sau seeing another woman. Witness asked Defendant to take her home to Nānākuli because it was past her "curfew." Despite Witness's requests to be taken home, Defendant drove to a dirt road beyond Keaʻau Beach Park.

When Defendant stopped the car, he put his hand on Witness's leg. She removed his hand. He then got out of the car, went over to the passenger side of the car and told her to get out. She objected but Defendant grabbed her arm and pulled her out of the car. Although she said she did not want to go for a walk, Defendant put his arm around Witness's shoulders and they walked until they reached a mattress lying on the ground.

Defendant pushed Witness onto the mattress. When she tried to sit up, he pushed her back down and held her down with his body. Witness began to cry and told Defendant to "get off" but he said, "kick back and relax." Despite her attempts to hold on to her pants, he removed her pants and unzipped his trousers. Defendant then committed the acts which constituted Rape in the First Degree, Kidnapping, and Sexual Abuse in the First Degree (Counts I–III). She had not consented to such contact by Defendant within the previous thirty days.

Defendant told Witness that if she related the events to anyone, he would make Sau hate her and "hurt" her family. At one point, she managed to get up and off the mattress, but Defendant grabbed her leg and told Witness that if she left, she would walk home "naked." After the assault, Witness did not immediately tell anyone what had happened because she was frightened and ashamed.

On May 16, 1986, Witness went to Sau's home and found Sau sitting with Defendant in Defendant's car. Sau got out of the car, placed Witness into the car, and went inside his house to get something to eat. Thereafter, Defendant drove off with Witness, saying he was going to the "7–Eleven" store. Witness told him that she did not want to go and asked to be taken back to Sau's home. Instead, Defendant drove to a beach.

Defendant then leaned toward the passenger side of the car, grabbed Witness's legs and pulled until she was lying on the seat. Defendant held Witness's hands above her head and tried to remove her pants. He pushed her pants to her ankles and forced her legs apart with his hands. Defendant then committed the acts that constituted Rape in the First Degree, Sodomy in the First Degree, Kidnapping and two instances of Sexual Abuse in the First Degree (Counts IV–VIII).

The day after testifying to the above events, Witness testified that the sexual assaults occurred in a different sequence. In his testimony, Defendant concurred with Witness's reconsidered testimony concerning the sequence but not the nature of the contacts. Witness testified that she told Defendant to stop and to "get off." She tried to close her legs but he forced her legs open with his hands. Witness also tried to push him away. She was afraid that Defendant would hurt her if she ran from him.

Defendant's version of the events was similar to Witness's version. The accounts differ on whether Witness consented to the sexual contacts. Defendant testified that he knew Witness because she would play "cards" with him and Sau at Sau's "place." Prior to May 9, 1986, Witness had approached him to talk about problems with her mother. Defendant testified that on May 9, 1986, Witness placed a call to the telephone at the "B & K" store near Sau's house. When Defendant answered the telephone, Witness told him not to tell Sau that she was on the line and told him to pick her up.

After picking her up, Defendant drove to the beach. They sat on the mattress after Witness gave her consent. Defendant then asked if he could make "love" to her and she said "yes."

Defendant testified that on May 16, 1986, Defendant was sitting in his car with Sau. Witness approached the car on the driver's side. She left, returned, and then went to the passenger's side of the car and spoke with Sau who left to get something to eat from his house. Witness entered the car. Defendant then told Witness that he was going to the "7–Eleven" store; Witness did not respond.

Instead of going to the store, he decided to go to a beach where Witness agreed to make "love." They made "love" in the front seat of the car.

They then returned to Sau's house where Defendant was also staying. Defendant lay down on a mattress and saw Witness lie down on another mattress on which Sau was sleeping. Later, Defendant found Witness engaging in sexual acts with Sau.

Defendant testified he did not use force or threats against Witness on May 9 or May 16, 1986.

Sau testified that sometime in May 1986, he received a phone call from Witness. He also testified that on or about May 16, 1986,

he was sitting with Defendant in Defendant's automobile which was parked outside of Sau's house. Sau got out of the car to get something to eat. Witness approached the car and told him she wanted to talk to him. He ignored her and told her to wait in the car. Witness indicated by words or actions that she did not want to get into the car. After being told, two or three times, to get into the car, Witness got into the car. Sau went into his house to get something to eat. When he returned about five minutes later, the car was gone. He went into a shack near his house and fell asleep. Later, he remembered Witness waking him up twice. He remembered seeing Defendant both times. The second time, Witness told him she was going home.

Lois Sobrado (Sobrado), Witness's hānai [7] stepmother, testified that on May 9, 1986, Witness came home from a dance, crying. At that time, Witness said she was crying because a friend was hit by a car. Sobrado also testified that a week later, Witness told her that Defendant had raped her at "Pray for Sex" beach.

Witness's sister (Sister) testified that on June 1, 1986, Sister, several of her friends, and Witness went to the beach. Defendant joined the group. Witness was very quiet and told Defendant to leave several times. Later, one of Sister's friends told Witness to retrieve a jacket from a bathroom. Witness then went to the bathroom. Defendant followed Witness. After a while, Sister followed them. She saw Defendant trying to kiss Witness. Witness was turning her face away from Defendant, crying, and telling Defendant to "leave her alone." Defendant told Sister to "beat it." Three of Sister's friends went into the bathroom to get Witness, but Defendant told them to leave. When Witness exited the bathroom, she was still crying. Sister also testified that Witness would ask if Defendant was at Sau's house and if Defendant was there, Witness would not go to the house.

Defendant testified that he went into the bathroom first and that Witness came up to

7. Hānai means "[f]oster, adopted." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary* 56 (Rev. ed. 1986). The child is not necessarily legally adopted.

him. She kissed him and then left. Defendant also testified that Witness was crying and told him that she had told others about their sexual relationship.

A police officer testified that although Witness had been referred to the Sex Abuse Treatment Center, as far as he knew, no medical report was issued for Witness.

## IV.

■ To "correct" the error, here, the court struck the offending portion of the prosecutor's closing argument and instructed the jury that it be "totally disregard[ed.]" The instruction was given immediately after the bench conference concerning the statement, and the court stated precisely which statement the jury was to disregard.

In addition to the court's admonition regarding the erroneous statement, the defense addressed the issue in its closing argument. The defense told the jury that there was "absolutely no evidence to support" the prosecutor's argument and reiterated the fact that the subject "remark was stricken from the record by the judge." Thus, the jury was reminded more than once to disregard the prosecutor's erroneous statement.

After both parties concluded their closing arguments and a recess was taken, the court read the instructions to the jury. For a third time, the jury was told that it "must disregard entirely any matter which the Court has ordered stricken." The court also instructed the jury that they were "the exclusive judges of the facts of [the] case" and that "[s]tatements or remarks made by counsel [were] not evidence. [Further, they] should consider [counsels'] arguments to [them] but [they were] not bound by [counsels'] recollections or interpretations of the evidence." The jury also received a written set of instructions.

Finally, there was evidence supporting the jury's verdict. Defendant admitted that he had engaged in the sexual acts with Witness, but he insisted he had her consent to do so, and he essentially confirmed most of Wit-

ness's testimony as it related to the events on the relevant dates. The only event Defendant claimed never occurred was his alleged attempt to prevent Witness from leaving at the time of the first incident.

Sau, Sobrado, and Sister corroborated parts of Witness's testimony.

Sau's testimony was consistent with Witness's as to the events that occurred on May 16, 1986 at Sau's house. Defendant's testimony also confirmed Witness's and Sau's testimony about the events at Sau's home on May 16, 1986, preceding the assault.

Sobrado corroborated Witness's testimony that Witness had initially told her that on May 9, 1986, Witness was going to a dance. Although, Witness did not immediately relate the events of the sexual assault to Sobrado, Witness later told Sobrado that she had been raped by Defendant.

Sister testified to Witness's rejection of Defendant and Witness's attempts to avoid Defendant after the assault occurred. Defendant confirmed Sister's account of his contact with Witness in the bathroom, although he testified that he did not detain her and that she kissed him and then left the bathroom.

In summary, the jury was told orally and in writing to disregard matters ordered stricken by the court. The court's first instruction to disregard the prosecutor's remark came immediately after the remark was made. Defendant's counsel reiterated the court's order in his final argument. The prosecutor's remark was interrupted before it was completed and was the only reference of its kind in the trial. In light of the brevity of the prosecutor's remark, the oral and written admonitions to the jury to disregard matters ordered stricken by the court, and the evidence presented at trial, we conclude that there was no reasonable possibility that the prosecutor's improper statement contributed to the conviction. "[T]aken in the context of the entire record, the prejudicial effect of the prosecutor's remark[ ] was removed by the prompt action of the trial court," *State v. Kahalewai*, 55 Haw. 127, 129, 516 P.2d 336,

338 (1973), and in light of the evidence pointing to guilt, the remark had "very little likelihood of altering the result of the trial[,]" *State v. Hirano*, 8 Haw.App. 330, 339, 802 P.2d 482, 487 (1990) (citation omitted). As a result, the error was harmless beyond a reasonable doubt, and the court properly denied Defendant's motions to reopen the evidence, for mistrial, and for new trial.

## V.

Accordingly, for the foregoing reasons, we affirm the judgment of conviction filed on August 14, 1992.

BURNS, Chief Judge, concurring.

I disagree with the majority's conclusion that a prosecutor's improper comment at trial, alerting the jury to a fact prejudicial to the defendant's case, violates defendant's constitutional right to a fair trial and is not a harmless error unless it is harmless-error-beyond-a-reasonable-doubt (HEBRD). In my view, the improper comment does not violate defendant's constitutional right to a fair trial and is a harmless error if it is harmless-error-more-probable-than-not (HEMPTN).

Hawai'i Rules of Penal Procedure (HRPP) Rule 52 states as follows:

### HARMLESS ERROR AND PLAIN ERROR

**(a) Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

**(b) Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Federal Rules of Criminal Procedure Rule 52(a) mirrors

HRPP Rule 52(a).

Although not explicitly stated in HRPP Rule 52(a), some errors are harmless errors if the harmlessness of the error is proven more probable than not. This is the HEMPTN degree. Other errors are harmless errors if the harmlessness of the error is proven beyond a reasonable doubt. This is the HEBRD degree. In each instance, the applicable degree should be clearly identified.

The United States Supreme Court has phrased both definitions in the negative. In their view, an error is not HEBRD if "there is a reasonable possibility that the [error] complained of might have contributed to the conviction." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). An error is not HEMPTN if it is "highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946).

However, the following two Ninth Circuit cases stated definitions of the HEMPTN degree that are easier to satisfy than the *Kotteakos* definition.

When prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) cited in *U.S. v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985). Prompt and effective action by the trial court may neutralize the damage by admonition to counsel or by appropriate curative instructions to the jury, *see, e.g., United States v. Mikka*, 586 F.2d 152, 156 (9th Cir.1978) *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979), but prosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict. *United States v. Flake*, 746 F.2d 535 (9th Cir.1984) *cert. denied* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985). We look to see whether the court's remarks

were sufficient to undo the harm of the prosecutor's remarks.

*United States v. Simtob,* 901 F.2d 799, 806 (9th Cir.1990).

Prosecutorial comments to which the defendant objects are reviewed for "harmless error." *United States v. Young,* 470 U.S. 1, 13 n. 10, 105 S.Ct. 1038, 1045 n. 10, 84 L.Ed.2d 1 (1985) (*Young*); *United States v. Endicott,* 803 F.2d 506, 513 (9th Cir. 1986) (*Endicott*). We need not reach the question whether a comment was improper if it is clear that the trial judge promptly neutralized any harm to the defendant by giving appropriate curative instructions to the jury. *Endicott,* 803 F.2d at 513. Where, however, a defendant's objection to prosecutorial remarks is overruled, we examine the remarks within the context of the whole trial to determine whether it is more probable than not that the allegedly · improper remarks materially affected the verdict. *Id.; United States v. Prantil,* 764 F.2d 548, 556 (9th Cir.1985).

*United States v. Chavez–Vernaza,* 844 F.2d 1368, 1377 (9th Cir.1987).

Hawai'i has also spoken in terms of harmful error rather than harmless error. However, Hawai'i's focus has been on the impact of the harmful error on defendant's right to a fair trial rather than on the jury's verdict. *State v. McGriff,* 76 Hawai'i 148, 871 P.2d 782 (1994), decided that "[p]rosecutorial misconduct [is harmful error that] warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *Id.* at 158, 871 P.2d at 792 (citations omitted).

In comparison, *Kotteakos* requires that the error did not have a "substantial influence[,]" *Kotteakos* 328 U.S. at 765, 66 S.Ct. at 1248, "upon the jury's decision[,]" *id.* at 764, 66 S.Ct. at 1247, whereas *McGriff* requires that the error did not cause "prejudice to the defendant's right to a fair trial." *McGriff,* 76 Hawai'i at 158, 871 P.2d at 792.

*Chapman* held that, among other constitutional rights, the constitutional rights to counsel and to an impartial judge are rights "so basic to a fair trial that their infraction can never be treated as harmless error[.]" *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–28. The court in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), specified some of the other constitutional rights that enjoy this very special protection. Errors violating these specially protected constitutional rights are separately categorized in a never harmless error (NHE) category. As noted in the majority's opinion, the NHE category also includes the impairment of a statutory right to peremptory challenges.

· *Chapman* held that other federal constitutional errors may be held harmless, but "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. It follows that federal nonconstitutional errors are harmless if they are HEMPTN.

Thus, there are three possible categories of error. First is the NHE category. Second is the HEBRD category. Third is the HEMPTN category. The difference between the HEBRD category and the HEMPTN category involves (1) the source of the right; and (2) the degree of proof required to show that the error did not prejudice the right.

| Possibility | Source of the Right | Decree of Proof |
|---|---|---|
| NHE | Constitution | Cannot be proven |
| | Not constitution | Cannot be proven |
| HEBRD | Constitution | Beyond a reasonable doubt |
| HEMPTN | Not constitution | More probable than not |

**306**

An error by the prosecutor or the judge at trial is not a harmless error unless either the HEMPTN or HEBRD criteria for forgiveness is applicable and satisfied. Although the prosecutor's improper remark in this case was not addressed to any of defendant's constitutional rights, the majority concludes that it violated the defendant's due process right to a fair trial and, therefore, the applicable criteria for forgiveness is the HEBRD criteria. Although the holding in this case involves only the prosecutor's improper remark, its rationale can be applied to all trial errors by a prosecutor or judge that alert the jury to a fact prejudicial to the defendant. In the context of harmless errors at trial, the majority's rationale does not distinguish between constitutional errors and nonconstitutional errors.

I disagree with the majority's rationale. An error by the prosecutor or judge is not a constitutional error simply because the jury witnessed it. The right to a fair trial does not include a right to a trial without any improper remarks by the prosecutor heard by the jury. Improper remarks by the prosecutor that are HEBRD or HEMPTN, whichever is applicable, do not prejudice a defendant's right to a fair trial.

The Hawai'i Supreme Court has never expressly stated that Hawai'i's application of HRPP Rule 52(a) differs from the federal application of FRCP Rule 52(a) in this respect. I know of no valid reason why the Hawai'i application should differ from the federal application in this respect.

In all other respects, I concur.